UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHN J. McGRATH, JR., and  :
DENISE McGRATH,            :
                           :    HONORABLE JOSEPH E. IRENAS
          Plaintiffs,      :    CONSOLIDATED CIVIL ACTION
                           :        NO. 06-2313 (JEI)
      v.                   :
                           :         **OPINION**
DONALD G. POPPLETON, and   :
BARBARA M. POPPLETON,      :
                           :
          Defendants.      :
                           :
---------------------------- :
                           :
AMERICAN EAGLE REALTY, INC., :
                           :
          Plaintiff,       :
                           :
      v.                   :
                           :
JOHN G. McGRATH, JR., and  :
DENISE McGRATH,            :
                           :
          Defendants.      :
---------------------------- :


**APPEARANCES:**

LOUIS McFADDEN, JR., ESQ.
2106 New Road, Suite F-4
Linwood, New Jersey 08221
          Counsel for John and Denise McGrath

BARRY, CORRADO, GRASSI & GIBSON, P.C.
By:  J. Christopher Gibson, Esq.
2700 Pacific Avenue
Wildwood, New Jersey 08260
          Counsel for Donald and Barbara Poppleton

EDWARD R. MURPHY, ESQ.
405 Loucroft Road
Haddonfield, New Jersey 08033
          Counsel for American Eagle Realty, Inc.

**IRENAS**, Senior District Judge:

This case principally involves the question of who is entitled to a $300,000 "non-refundable deposit," which Defendants, Donald and Barbara Poppleton ("the Poppletons"), paid upon signing a contract to purchase a beach house from Plaintiffs, John and Denise McGrath ("the McGraths").[1]  The Poppletons ultimately did not purchase the subject property, and the McGraths eventually sold the property to another buyer.  The McGraths claim that the Poppletons breached the contract of sale.  The Poppletons counterclaim that the McGraths breached the alleged oral agreement that modified the written contract.

The McGraths move for summary judgment on their breach of contract claim and the Poppletons' breach of contract counterclaim. For the following reasons, the Court will grant the McGraths' Motion in its entirety.  The Court will also grant the McGraths summary judgment on: (1) the Poppletons' counterclaim for breach of the implied duty of good faith and fair dealing; and (2) American Eagle's breach of contract claim.  Lastly, the Court will grant American Eagle judgment on the pleadings as to the McGraths'

---

[1]  The related question, raised by Plaintiff American Eagle Realty, Inc.'s ("American Eagle") consolidated suit against the McGraths, is whether American Eagle, the Poppletons' real estate agent, is entitled to an $80,000 commission.  However, as will become readily apparent from the Court's discussion, the answer to this question depends on the Court's disposition of the McGrath v. Poppleton suit.

counterclaim for breach of contract.[2]

## I.

The McGraths and Poppletons signed a "Contract for Sale of Real Estate" on July 22, 2005. (McGrath Ex. 2.)  The contract was a standard form contract prepared by William Leahy of American Eagle, the Poppleton's real estate agent.  (Id.)[3]  In the contract, the McGraths agreed to sell their property at 153 76th Street in Avalon, New Jersey, to the Poppletons for $4.175 million dollars. (Id.)  The other relevant portions of the contract state:

> 3. <u>PAYMENT OF PURCHASE PRICE</u>.  The Buyer will pay the purchase price as follows:
>
> a. Initial Deposit *                    300,000.00
> * This deposit will be non-refundable.  If Buyer does not proceed with settlement, then said monies are to be released to Seller.  The only exception would be if Buyer could not receive a clear title to the property as stated in this contract, in which event said monies would be returned to the Buyer and there would be no further liability on either party.
>
> b. Additional deposit due: None
>
> c. Balance to be paid at closing of title, from Buyer and/or mortgage financing, in cash or by certified or cashier's check (See Paragraph five (5) for mortgage financing contingency.)    3,875,000.00
>
> . . .

---

[2]  The Court has subject matter jurisdiction over both cases pursuant to 28 U.S.C. § 1332.

[3]  The last two lines of the contract read: "Contract for sale of real estate prepared for and adopted by the Greater Cape May County Board of REALTORS 2000 and modified by American Eagle Realty, Inc. (1/98, 8/98)." (McGrath Ex. 2.)

[Paragraph 5., entitled, "<u>MORTGAGE FINANCING
CONTINGENCY</u>" is crossed out in its entirety and
initialed by the McGraths and the Poppletons.]

6. <u>CLOSING</u>.  Closing will be held at Title Co. of
Buyer's Choice---- on or before March 31, 2006, at
11:00 AM unless more time is needed to obtain title
insurance.  If so, up to thirty (30) days will be
allowed.  Other extensions can be made if the Buyer
and Seller agree in writing.

. . .

8. <u>BUYER FINANCIALLY ABLE TO CLOSE</u>. Buyer represents
that Buyer has sufficient cash available (together
with the mortgage financing referred to in Paragraph
five (5), if applicable) to complete this purchase.

. . .

23. <u>CANCELLATION and DEFAULT</u>.  The parties have the
right to cancel this contract under certain
circumstances described in this contract. In such
case, a party must give written notice to the other
party. If this contract is cancelled, the deposit
money shall be promptly returned to the Buyer, and
the Seller and the Buyer shall be released from all
further liability to each other and to the
Broker(s).  If the Buyer does not make settlement in
accordance with the terms of this contract, all
deposit monies may be retained by the Seller on
account of the purchase price or as compensation for
damages and expense which the Seller has incurred.
If the Seller elects to consider the deposit moneys
as compensation for damages, this contract shall be
cancelled without any further liability on either
party, except the Seller may be liable to the Broker
for commission according to the terms of the
Seller's Listing Contract.  In the event that the
Seller does not perform in accordance with this
contract, the Buyer has the choice of demanding
return of all deposit monies, together with
reasonable costs incurred for an examination, title
survey, mortgage application and fees and any
inspection fees relating to the purchase of this
property or the Buyer may initiate any legal or
equitable action to which the Buyer may be entitled

4

to [sic].

. . .

33. <u>PARTIES LIABLE</u>. This contract is binding upon all parties who sign it and all who succeed to their rights and responsibilities.

34. <u>ENTIRE AGREEMENT</u>.  This contract contains the entire agreement of the parties.  No representations have been made by any of the parties, the BROKER(S) or their agents except as set forth in this Agreement.

(Id.)

As indicated *supra*, the McGraths and Poppletons agreed to no mortgage contingency.  They also agreed to eliminate the standard "Wood Boring Insect Inspection" and "Buyer's Right to Home Inspection" contingencies.  (Id.)

Closing was set to occur on March 31, 2006, approximately eight months after the parties signed the contract.  (Id.)  William Leahy testified that "in order to have the agreement signed by John [McGrath]," the Poppletons had to agree to pay the non-refundable deposit.  (Leahy Dep. p. 19.)  The McGraths' real estate agent, James McDonald, also states in his affidavit, "[w]hen the McGraths entered into the original real estate agreement with the Poppletons on July 22, 2005, John McGrath was only agreeable to scheduling a distant closing in March of 2006 on the condition that the Poppletons tender a $300,000.00 non-refundable deposit."  (McDonald Aff. ¶ 7.)

John McGrath testified that he asked for the $300,000 deposit

because the Poppeltons requested a closing date so far removed from when they signed the contract, and he wanted more assurance that he would not lose money in the event that the sale fell through. (McGrath Dep. P. 10.)  McGrath explained,

> When we -- when [the Poppeltons] finally made the deal, they wanted a March settlement, which I would have had to take my house off the market for eight months.  And that scared me because I was in the process of . . . buying another property . . . and I needed the money from that one to get the other one. . . . [W]e had other people that were still interested in my house.  I said if they were stepping to the plate first, I said, if I take it off the market for eight months, then I'm gonna ask that the realtors don't get a commission and I keep the deposit money and there's no contingency on mortgage or the sale of their house. . . .
> I've been in a number of real estate deals and you don't know where the market's going, but if I'm buying another property where I'm paying $30,000 a month for it, I need-- you know, if I have to put my house back on the market in March then I could be stuck another 10 months times 30,000 is 300,000.[4]

(McGrath Dep. p. 10-11.)

Leahy arranged to loan the Poppeltons $300,000 for the deposit.  On July 29, 2005, Leahy and his wife, as "co-trustees of the American Eagle Realty, Inc. defined pension plan and trust," lent the Poppeltons $300,000.  ("Mortgage Note," American Eagle Ex.

---

[4]   As recent events have demonstrated, house prices can change dramatically in the span of eight to ten months, resulting in a substantial risk of loss in value to the seller.  If housing prices were to decrease during the period between contracting and closing, the McGraths would lose money.  On the other hand, if prices were to increase, the McGraths would not benefit from the increase because the agreed-upon price would reflect the earlier market value of the property, not the current value.

4.)[5]  The loan from the pension plan was secured by a mortgage on the Poppletons' residence at 12 99th Street, in Stone Harbor, New Jersey. ("Subordinate Mortgage," American Eagle Ex. 5.)  The McGraths were not aware of the loan.  Indeed, Leahy contacted the Real Estate Commission to ask whether "it was legal . . . for the pension plan to loan Poppleton money without disclosing anything to the McGraths."  (Leahy Dep. at 81.)[6]

Approximately seven months passed, and then, in March, 2006, the Poppletons, through Leahy, informed the McGraths' agent that the Poppletons needed to sell their current residence in order to have sufficient funds to purchase the Avalon property.  (Leahy Dep. p. 20.)  The Poppletons, however, were having trouble finding a buyer.  With less than a month until the scheduled closing date, Leahy contacted real estate investor, Robert Herdelin, to see if Herdelin would be interested in buying the Poppletons' property.[7] (Herdelin Dep. p. 10-13.)  Herdelin offered to purchase the Poppletons' property for $3 million in cash; however, the

---

[5]  American Eagle has submitted an "opposition brief" to the McGrath's motion against the Poppletons.  American Eagle did not request leave to submit materials in opposition to a motion that does not technically involve its claim against the McGraths.  However, given the interrelation of the facts and legal issues, and because neither the McGraths, nor the Poppletons, have objected to American Eagle's submission, the Court has considered American Eagle's submission.

[6]  The Poppletons paid-off the loan on August 23, 2005.  (American Eagle Ex. 6.)

[7]  Herdelin testified that he had purchased four or five investment properties through Leahy in the three years prior to March, 2006. (Herdelin Dep. p. 11-12.)

7

Poppletons "could not accept the offer since it left [them] with insufficient funds to close on the McGrath property."  (Poppletons' Answer to Interrogatory #3.)  According to Donald Poppleton, he needed to sell his house for $3.6 million in order to have sufficient funds to pay for the Avalon property.  (Poppleton Dep. p. 20; Leahy Dep. p. 41.)  In other words, Poppleton needed a way to make up a $600,000 deficit.

Leahy, on behalf of the Poppletons, then spoke with John McGrath about the situation.  During several conversations that took place over March 14 through 16, 2006,

> [Leahy and McGrath] discussed the potential proposal
> of McGrath reducing his purchase price [on the
> Avalon property] by $300,000.00 and Herdelin
> increasing his offer by $200,000.00 for the purchase
> of [the Poppletons'] home.  Mr. Leahy then spoke to
> Donald Poppleton and after some additional
> negotiating between McGrath and Leahy as well as
> Leahy and Herdelin, McGrath agreed to reduce his
> sale price by $300,000.00 which enabled Poppleton to
> accept Herdelin's $3 million offer.  Further, Leahy
> agreed to waive his commission [on the Poppleton-
> Herdelin sale] as further assistance to Poppleton.

(Poppleton Answer to Interrogatory #3.)  In the end, Herdelin would not agree to increase his purchase price for the Poppletons' home (Leahy Dep. p. 42), but McGrath did indicate in a telephone conversation with Leahy that he would agree to reduce the price of the Avalon property by $300,000.00.  (McGrath Dep. p. 11.)  While the specific details of what was said during the phone call between Leahy and McGrath are somewhat disputed, McGrath and Leahy both testified that they only discussed Herdelin's intent to purchase

8

the Poppletons' home for $3 million and McGrath reducing the price on the Avalon property from $4.175 million to $3.875 million. (Leahy Dep. p. 31, 41-43; McGrath Dep. p. 18-20, 25.)

Shortly thereafter, Leahy drafted an "addendum" to the Sale Agreement, which purported to memorialize the oral agreement reached by McGrath and Leahy (the "Addendum").[8]  The Poppletons signed the Addendum on March 18, 2006.  (McGrath Ex. 7.)  It states, in relevant part,

The undersigned do hereby agree to the following:

1.   Paragraph 2: Sale price is changed from $4,175,000 to $3,875,000.

2.   Paragraph 3c: Balance at closing is changed from $3,875,000 to $3,575,000.

3.   Paragraph 6: Closing is changed from March 31, 2006, at 11:00 a.m. to April 3, 2006 at 12:00 noon.

4.   Additional Paragraph added to contract: This sale is contingent upon Buyer successfully completing settlement of the property they currently own at 12 99th Street, Stone Harbor, New Jersey. Otherwise, this agreement shall become null and void.

OTHER SALE AGREEMENT CLAUSES.  All other clauses in the sale agreement remain the same.

(McGrath Ex. 7.)  Leahy forwarded the Addendum to the McGraths, who refused to sign it.

Less than two weeks later, on March 31, 2006, the McGraths

---

[8]   The Poppletons' counterclaim clearly asserts that the Addendum is the written memorialization of the terms which were agreed to orally.  (Answer, ¶¶ 29-31.)

appeared at closing, ready to sell their Avalon property to the Poppletons according to the terms of the original written Sale Agreement.  (McGrath Ex. 12.)  The Poppletons did not attend. Presumably, the McGraths were not surprised when the Poppletons failed to attend the closing.  On March 22, 2006, the Poppletons' attorney wrote the McGrath's attorney, stating, "[a]s a result of your clients' anticipatory breach of the modified agreement of sale, my clients will not be attending closing on March 31, 2006. Accordingly, the agreement is null and void." (McGrath Ex. 11.)

Herdelin cancelled his contract to purchase the Poppletons' home pursuant to the standard three-day attorney review clause of the contract.[9]  The McGraths sold the Avalon property to Jordan Realty, Inc., on April 1, 2006, for $3.9 million.

The McGraths filed suit against the Poppletons and American Eagle asserting two counts: (1) breach of the written Sale Agreement against the Poppletons; and (2) a claim against American Eagle as the escrow agent holding the $300,000 deposit.  The Poppletons Answered the Complaint, asserting two counterclaims against the McGraths: (1) breach of the orally modified Sale Agreement; and (2) breach of the implied covenant of good faith and fair dealing, based on the McGraths' sale of the Avalon property to

---

[9]   As required by New Jersey law, all broker-prepared contracts for the sale of real estate must provide for a three-day attorney review period after the contract is signed.  Within those three days, the buyer may cancel the contract upon written notice, without any liability.  *See N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds.*, 93 N.J. 470 (1983).

Jordan Realty.

American Eagle also Answered, and asserted crossclaims for indemnification and contribution against the Poppletons.  However, American Eagle later settled the claim against it as the escrow agent, and was dismissed from the case.[10]  But that was not the end of American Eagle's involvement in this case.  Less than two months after it was dismissed as a defendant, American Eagle filed its own lawsuit against the McGraths, seeking its $80,000 commission, claiming that the McGraths breached the Sale Agreement, as modified by oral agreement.  The McGraths answered, asserting their own counterclaim, which alleges that American Eagle breached the commission contract by filing suit against the McGraths to recover the commission.  American Eagle's suit has been consolidated with the McGraths' suit.

Presently, only the McGraths have moved for summary judgment on: (1) their one-count Complaint against the Poppletons (breach of the written Sale Agreement); and (2) the Poppletons' Counterclaim 1 (breach of the orally modified Sale Agreement).  The McGraths have not moved for summary judgment on Counterclaim 2 of the Poppletons' Answer (breach of the implied covenant of good faith and fair dealing); nor have they moved for summary judgment on either American Eagle's claim against them, or their counterclaim against

---

[10]  The Stipulation of Dismissal does not address American Eagle's crossclaims; however, those claims obviously became moot when American Eagle was dismissed as a defendant.  Accordingly, the Court will issue an appropriate order dismissing as moot American Eagle's crossclaims.

11

American Eagle, although American Eagle concedes that if the Court holds that there was no oral modification, and the written Sale Agreement is enforceable, that it is not entitled to any commission.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'- that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).

## III.

### A.

The issue is whether the unsigned Addendum to the Sale Agreement is enforceable.[11]

First, Paragraph 34 of the Sale Agreement provides, "This contract contains the entire agreement of the parties.  No representations have been made by any of the parties, the BROKER(S) or their agents except as set forth in this Agreement."  Also, several other paragraphs require that changes to the contract must be made in writing.[12]  Thus, the record evidence demonstrates that the parties agreed, from the outset, that the Agreement could be modified only by written agreement.[13]

But whether or not the parties intended that all modifications be in writing, at common law, a "no oral modification" clause may be waived by the parties by entering into an otherwise enforceable

---

[11]  This Court, sitting in diversity, applies the laws of New Jersey. *See Erie R.R. v. Tompkins,* 304 U.S. 64 (1938).

[12]  *See* McGrath Ex. 2, Sale Agreement, ¶¶ 6 (closing date may be extended if Buyer and Seller agree in writing); 29 (all notices must be in writing; Buyer and Seller may agree in writing to extend 72-hour notice provision); 30 (Agreement cannot be assigned without written consent of the Seller); 31 (Agreement cannot be recorded without the written consent of all parties); 32 (the Buyer and Seller may agree in writing to extend the three-day attorney review period).

[13]  While the Sale Agreement did not have an explicit "no oral modification" clause, the parties' intent that all modifications be in writing may be reasonably inferred from the provisions requiring changes to be in writing.

oral agreement.  *See generally*, Williston on Contracts § 29:42 ("At common law, an oral agreement is sufficient to modify or rescind a written contract, notwithstanding a provision in the written contract purporting to require that subsequent modifications be evinced by a writing.").[14]  Accordingly, the question remains: is the Addendum enforceable?

"A proposed modification by one party to a contract must be accepted by the other to constitute mutual assent to modify. Unilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract." *County of Morris v. Fauver*, 153 N.J. 80, 100 (1998) (internal citations omitted).[15]

---

[14]  *See also,* 17A Am. Jur. 2d Contracts § 514 ("The rule followed by the courts generally, . . . is that unless a contract is required by law to be in writing, the contract can be modified orally, even though it provides that it can be modified only in writing."); *cf.* N.J.S.A. 12A:2-209(2) (Uniform Commercial Code)("A signed agreement which excludes modification or rescission except by a signed writing cannot otherwise be modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.").

[15]  The McGraths argue that the Addendum is unenforceable because it is barred by the Statute of Frauds.  The New Jersey Statute of Frauds states,

An agreement to transfer an interest in real estate . . . shall not be enforceable unless:

a. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement, and the identity of the transferor and transferee are established in a writing signed by or on behalf of the party against whom enforcement is sought; or

b. a description of the real estate sufficient to identify it, the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee are proved by clear and convincing evidence.

N.J.S.A. 25:1-13.  While it does appear that the Statute of Frauds may apply to certain oral modifications of written contracts that are subject to the

Because the record is completely devoid of any evidence that the McGraths, at any time, agreed to change the parties' non-contingent contract into a contract contingent upon the sale of the Poppletons' home, summary judgment in favor of the McGraths is warranted.

The Poppletons' only evidence of the parties' oral agreement is Leahy's testimony regarding the telephone conversations he and McGrath had about Herdelin buying the Poppleton's house and McGrath reducing the purchase price of the Avalon property.  Specifically, Leahy testified,

> Mr. McGrath called me and asked me to explain what was
> the problem here, and I told him that Don Poppleton . .
> . wasn't going to settlement until-- without selling
> his property, and then I explained . . . the difference
> was a net of $600,000, and so Mr. McGrath . . .
> initiated $200,000 in negotiations, then Poppleton came
> up 100,000, Herdelin won't move at all.  So McGrath
> says, I'll put another hundred thousand in, I'll reduce
> my price another hundred thousand, which brings it down
> to the three million 875, and get either Herdelin or

---

statute, *see, e.g., Mazza v. Scoleri*, 304 N.J. Super. 555, 559 (App. Div. 1997), it is not apparent that the Statute of Frauds, as currently drafted, would bar enforcement of the Addendum, because the Addendum does not alter any of the written, signed, terms addressing the "description of the real estate . . ., the nature of the interest to be transferred, the existence of the agreement and the identity of the transferor and the transferee."  This language appears to significantly narrow the Statute of Frauds' application, as compared to the previous version of the statute (effective from 1991 to 1995), which read, "No action shall be brought . . . unless the agreement or promise upon which such action shall be brought or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith . . . A contract for sale of real estate, or any interest in or concerning the same." N.J.S.A. 25:1-5(d) (1991).  Indeed, under the '91-'95 Statute of Frauds, the Addendum might well be unenforceable because it "concerns" the sale of real estate.  The Court has found no New Jersey authority discussing the nature or extent of the apparent change in the statute; or whether, in cases such as this, the change was intended to produce a different result. With virtually no caselaw interpreting the statute as it might apply in this case, the Court will decline to rule on the Statute of Frauds issue in favor of disposing of the case on an alternative ground.

> Poppleton to come up with the other 200,000.
>     So then Poppleton comes up with 100,000, Herdelin
> still says zero, so you're still 100,000 shy.  And then
> at the end with the verbal agreement there . . . Mr.
> Poppleton said he'd come up with the final $100,000 to
> proceed with settlement.  So the price was reduced by
> $300,000.
>
> . . .
>
> I called Mr. McGrath in the morning of [March] 16th
> [2006] and told him that Bob Herdelin was coming down
> to buy the property so that Poppleton could buy his,
> Mr. McGrath asked me to call him back when it was
> finalized.  And so I did that at that night with Mr.
> Herdelin, and so we at that point agreed to the terms,
> and then I was to get everything signed by Mr.
> Herdelin, and then by the Poppletons, and then Jim
> McDonald was to get them signed by Mr. McGrath.

(Leahy Dep. p. 31, 43.)  This evidence, viewed in a light favorable
to the Poppletons, at most, establishes that the McGraths would
have accepted $3.875 million for the Avalon property at the
scheduled closing on March 31, 2006.  Indeed, if the Addendum only
changed the purchase price, this would be a much closer case.

But paragraphs 3 and 4 of the Addendum go far beyond modifying
the sale price.  Paragraphs 3 and 4 modify the closing date and add
a material contingency.  Leahy's testimony certainly does not
establish that McGrath agreed to change, at the eleventh hour, what
had been a non-contingent contract into a contract that was
contingent on the sale of the Poppletons' Stone Harbor residence.
While Leahy's testimony establishes that McGrath knew that the
Poppletons asserted that they needed to sell their house in order
to have the funds to pay for the Avalon property, the testimony by

16

no means proves that McGrath agreed that the Poppletons would only be obligated to purchase the Avalon property if they sold their house.[16]

Accordingly, the Addendum is unenforceable and summary judgment in favor of the McGraths is warranted on the Poppletons' first counterclaim.

B.

While the above discussion disposes of the Poppletons' counterclaim for breach of the oral agreement, it does not necessarily follow that the McGraths are also entitled to summary judgment on their claim for breach of the written Sale Agreement. The Poppletons' second counterclaim asserts that the McGraths breached the implied covenant of good faith and fair dealing.  If this Court were to hold that the McGraths did breach their duty in this regard (by agreeing, before March 31, 2006, to sell the Avalon property to Jordan Realty), they would not be entitled to summary judgment on their breach of contract claim, which asserts that the Poppletons breached the Sale Agreement by failing to proceed with

---

[16]   In opposition to summary judgment, the Poppletons stress, "[t]he cases are legion that caution against the use of summary judgment to decide a case that turns on intent and credibility of the parties." (Poppleton Br. p. 10; citations omitted.)  Credibility is not an issue here.  Even if the Court completely believes Leahy's testimony, that evidence falls far short of the evidentiary standard required to prove that the parties agreed to change a non-contingent agreement into an agreement contingent upon the sale of the Poppletons' home-- a condition almost entirely within the control of the Poppletons.

17

settlement on March 31, 2006.  (Compl. ¶ 24.)[17]  It is black letter contract law that one party's material breach excuses the other party from performing.[18]  Accordingly, if the McGraths breached the Sale Agreement before March 31, 2006, then the Poppletons were excused from performing on March 31, 2006, and could not have breached the Sale Agreement.

This situation presents somewhat of a procedural conundrum. The McGraths have moved for summary judgment on their own breach of contract claim (Count 1 of the Complaint) but have not moved for summary judgment on the Poppletons' second counterclaim, which, as just explained, must be addressed in order to dispose of the motion for summary judgment on Count 1 of the Complaint.  No other party has any sort of motion pending, and the deadline for dispositive motions has long since passed.[19]

---

[17]  In the McGraths' brief, they argue that "[t]he [Poppletons] breached the contract by intentionally misrepresenting that they had sufficient cash available to complete the purchase."  (McGrath Br. p. 14.)  However, this is not what is pled in the Complaint.  The Complaint clearly alleges: "By failing to attend closing and failing to pay the balance of the purchase price for the Avalon property, Defendant-Buyers breached the July 22, 2005 Contract for Sale of Real Estate, and thereby forfeited the deposit monies in the amount of $300,000.00."  (Compl. ¶ 24.)  The Complaint contains no allegations about the Poppletons misrepresenting their ability to pay in cash and does not even reference that portion of the Sale Agreement where the Poppletons represented that they had "sufficient cash available to complete this purchase."  (Sale Agreement ¶ 8.)

[18]  *See Frank Stamato & Co. v. Lodi*, 4 N.J. 14, 21 (1950) ("The fact that the defendant has been guilty of substantial breaches of essential obligations under the contract would ordinarily give the plaintiff the right to deem itself discharged from further performance and to sue the defendant for damages under the contract."); *Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 285 (App. Div. 1998) ("It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance.").

[19]  The deadline was October 17, 2007.

18

It is possible that the McGraths assumed that the second counterclaim asserts a breach of the duty of good faith and fair dealing as implied in the *orally modified* Sale Agreement.[20]  An expansive interpretation of the second counterclaim's allegations would be that the McGraths breached the implied duty of good faith and fair dealing by selling the Avalon property to Jordan Realty on April 1, 2006, when the closing date for the McGrath-Poppleton sale (as modified by the oral agreement) was April 3, 2006.  If this were indeed what the second counterclaim alleged, summary judgment would, of course, be warranted, as the Court has already held that there was no legally enforceable oral agreement.

However, another interpretation is that the second counterclaim is pleading in the alternative.  That is, the second counterclaim may be interpreted to allege that even if there was no oral modification, by agreeing, on March 21, 2006, to sell the Avalon property to Jordan Realty (McGrath Ex. 8), the McGraths breached the covenant of good faith and fair dealing as implied in the *original written* Sale Agreement.  Indeed, the Court believes that this second interpretation is more faithful to what was actually pled:

> 38.  Plaintiffs claim to have attended closing ready, willing and able to perform under the terms of the original contract.

---

[20]  Because the McGraths do not address the issue at all, the Court can only speculate as to the reasons for the omission.

> 39.  Before the closing date of March 31, 2006,
> plaintiffs signed an agreement of sale of the subject
> premises to a third party, Jordan Realty.
>
> 40.  At the point plaintiffs signed an agreement of
> sale with Jordan Realty, plaintiffs had not yet been
> notified by defendants that they were unable to proceed
> to closing or unwilling to proceed to closing.
>
> 41.  Accordingly, plaintiffs breached the implied
> covenant of good faith and fair dealing by agreeing to
> sell the property to the third party.

(Poppleton Answer / Counterclaims ¶¶ 38-41.)  Given this second
interpretation, if the Court is to rule on the McGraths' Motion
with respect to Count 1 of the Complaint, it must rule on the
Poppletons' second counterclaim.[21]

Thus, turning to the Poppletons' second counterclaim, the
undisputed documentary evidence demonstrates that the McGrath-
Jordan Realty sale was contingent upon the failure of the McGrath-
Poppleton sale.  The McGrath-Jordan Realty "Contract for the Sale
of Real Estate" was signed on March 21, 2006 (McGrath Ex. 8)--
after the McGraths received the Addendum which did not meet with
their approval.  Moreover, the McGrath-Jordan Realty contract
contained the following paragraph:

---

[21]  The alternative course of action would be to decline to rule on the
McGraths' breach of contract claim, because neither party has briefed the
legal issues raised by the Poppletons' second counterclaim.  Such a course of
action, however, would result in a waste of judicial resources.  The
dispositive motion deadline passed seven months ago.  The Court does not have
the option to wait to see if any other motions are filed.  By declining to
rule on the McGraths' present motion, the Court would effectively be deciding
to hold a trial on issues, which, as demonstrated *infra*, clearly do not
require a trial.  Thus, in keeping with Fed. R. Civ. P. 1's direction to
construe and administer the Rules "to secure the just, speedy, and inexpensive
determination of every action," the Court will rule on the Poppletons' second
counterclaim.

SETTLEMENT CONTINGENCY. Buyer and Seller acknowledge the existence of a fully signed, valid Agreement of Sale signed by Donald G. and Barbara M. Poppleton on July 22, 2005 for the purchase of the subject premises located at 153 76th Street, Avalon, NJ 08202.  Said Agreement of Sale calls for settlement on Friday, March 31, 2006.  Buyer has indicated that they are not on [sic] a position to settle per the terms of the Agreement of Sale on March 31, 2006.  As a result, this Agreement of Sale is contingent upon the Buyer (Poppleton) breaching their Agreement by not settling per the terms of their Agreement on or before close of business on March 31, 2006.  If Buyer (Poppleton) settles per the terms of their Agreement on or before March 31, 2006, this Agreement shall be void and all deposit monies shall be returned to the Buyer and there shall be no further liability on either party. . . .

(McGrath Ex. 8).

While the above paragraph was crossed out in its entirety and initialed by the McGraths, it was subsequently replaced with an addendum, dated March 24, 2006:[22]

Paragraph 42 of the attached Agreement of Sale is hereby eliminated and in its place the following is inserted:

42. Settlement Contingency. Buyer and Seller acknowledge the existence of a fully signed, valid Agreement of Sale signed by Donald G. and Barbara M. Poppleton on July 22, 2005 for the purchase of the subject premises located at 153 76th Street, Avalon, NJ 08202.  Said Agreement of Sale calls for settlement on Friday, March 31, 2006.  Poppletons, through their attorney, have advised Seller that they consider this Agreement null and void and have demanded a refund of their deposit money.  Seller's counsel has advised Seller that Poppletons may change their position and appear at settlement as required on March 31, 2006.  As a result, this Agreement of Sale is contingent upon Poppletons breaching their agreement on or before the

---

[22]   March 24, 2006, was the last day of the mandatory three-day attorney review period.

21

> close of business on March 31, 2006.  If Poppletons
> settle under the terms of their agreement on or before
> March 31, 2006, this Agreement shall be null and void
> and all deposit monies shall be returned to the Buyer
> and there shall be no further liability on either
> party. . . .

(McGrath Ex. 9.)  Thus, a reasonable factfinder could only conclude that the McGraths intended to honor the terms of the written Sale Agreement with the Poppletons.

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing. . . . 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (1997)(quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). "A party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000)(citing *Sons of Thunder*).

It is clear that the McGraths did nothing to "injure the right of" the Poppletons "to receive the fruits of the contract," nor did the McGraths act inequitably or in bad faith.  All the record evidence indicates that, had the Poppletons attended settlement on March 31, 2006, the McGraths would have been able to convey title to the Avalon property.

Accordingly, summary judgment in favor of the McGraths is

warranted on the Poppletons' second counterclaim (breach of the duty of good faith and fair dealing).

C.

Having determined that the McGraths did not breach the Sale Agreement as orally modified (because there was no legally enforceable oral modification), and having determined that the McGraths did not breach the duty of good faith and fair dealing implied in the original written Sale Agreement, the Court can now also hold that the Poppletons breached the written Sale Agreement. The parties do not dispute that the Poppletons failed to attend closing on March 31, 2006.  Performance was due on March 31, 2006-- namely, the Poppletons were obligated to pay the remaining balance of the purchase price for the Avalon property.  They did not. Accordingly, the Court will grant summary judgment to the McGraths on their breach of contract claim.

D.

Additionally, American Eagle is not entitled to its commission.  American Eagle's breach of contract claim asserts that the McGraths breached "the Agreement of Sale as agreed to [by] Defendants on March 16, 2006, thereby depriving Plaintiff of the commission which it would have received at the sale taken [sic] place on April 3, 2006."  (American Eagle Compl. ¶ 16.)  The Court

23

has already held that the alleged March 16, 2006 agreement (i.e., the Addendum) is not legally enforceable.[23]   Accordingly, summary judgment will be entered in favor of the McGraths and against American Eagle.

E.

Lastly, only the McGraths' counterclaim against American Eagle remains.   The counterclaim asserts:

> 1. On July 28, 2005, the Plaintiff, American Eagle, Inc., by and through it's [sic] agent, William Leahy, entered into a written contract with the defendants, John and Denise McGrath that governed the Plaintiff's rights to receive a real estate commission in connection with the McGrath to Poppleton real estate contract of sale dated July 22, 2005 (hereinafter, "commission contract" attached hereto and incorporated herein as Exhibit A).
>
> 2.  The Plaintiff's complaint against the McGraths for commissions due in connection with the McGrath to Poppleton sales contract dated July 22, 2005 *constitutes a breach of the commission contract*.

(McGrath Answer / Counterclaim ¶¶ 1-2.)(emphasis added).

Exhibit A is a letter signed by William Leahy of American Eagle and a representative of Avalon Real Estate Agency.[24]   The entire letter reads,

---

[23]   Also, American Eagle has conceded that, "[i]f the court determines that Mr. and Mrs. McGrath are entitled to the $300,000 deposit plus interest, then American Eagle Realty Company is not entitled to a commission on the sale."  (American Eagle's "Counterstatement of Alleged Undisputed Material Facts," ¶ 1.)

[24]   Avalon Real Estate Agency was the McGraths' realtor.  The letter is signed by "William K. [last name illegible]."

Dear John and Denise:

This is to confirm that if settlement does not proceed and the Buyer's deposit of $300,000 is released to you per the terms of Paragraph 3.a. of the Agreement of Sale dated July 25, 2005, then no real estate commission will be paid to either of our agencies.

(McGrath Answer / Counterclaim Ex. A.)

American Eagle is entitled to judgment on the pleadings.[25]  It is obvious that the McGraths mislabeled a *defense* against American Eagles' claim for commission as an *affirmative claim* for relief. Under no set of facts could the McGraths recover on their counterclaim against American Eagle.  The contract says nothing about forbearing from filing suit to recover a commission.

While American Eagle is not entitled to its commission, it does not follow that the McGraths are entitled to recover damages from American Eagle for filing suit to recover its commission. Accordingly, the McGraths' counterclaim against American Eagle will be dismissed.[26]

---

[25] *See* Fed. R. Civ. P. 12(c).

[26] "[F]or a court to grant judgment on the pleadings, *sua sponte*, is not error.  The district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action."  *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980); *see also*, *Michaels v. New Jersey*, 955 F. Supp. 315, 331 (D.N.J. 1996)(Barry, J.)("It is well established that, even if a party does not make a formal motion to dismiss, the court may, *sua sponte*, dismiss the complaint where the inadequacy of the complaint is clear."); *see generally,* 5B Wright & Miller, Federal Practice and Procedure, § 1357 ("Even if a party does not make a formal motion under Rule 12(b)(6), the district judge on his or her own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties.").

**IV.**

For the reasons set forth above, summary judgment will be granted to Plaintiffs John and Denise McGrath as to: (1) the Poppletons' breach of contract counterclaim; (2) the Poppletons' breach of the duty of good faith and fair dealing counterclaim; and (3) the McGraths' breach of contract claim.  Accordingly, the McGraths are entitled to the $300,000 non-refundable deposit currently held in escrow.

With regard to American Eagle's suit, summary judgment will be granted to the McGraths on American Eagle's breach of contract claim, and judgment on the pleadings will be granted to American Eagle as to the McGraths' counterclaim.

The Court will issue an appropriate order.


Date: May 6th, 2008

                              s/ Joseph E. Irenas
                         **JOSEPH E. IRENAS, S.U.S.D.J.**